George L. STANSIFER, dba Lakewood Sports Cars, Plaintiff-Appellant,

v.

CHRYSLER MOTORS CORPORATION, and J. O. Fisher Corporation (Jim Fisher Motors), Defendants-Appellees.

No. 71–2460.

United States Court of Appeals, Ninth Circuit.

Oct. 30, 1973.

C. R. Lonergan (argued), Ray Siderius, Siderius, Lonergan & Crowley, Seattle, Wash., for plaintiff-appellant.

Carl H. Hagens (argued), Skeel, McKelvy, Henke, Evenson & Betts, Richard L. Prout, Mullavey, Hageman, Prout & Kirkland, Seattle, Wash., for defendants-appellees.

Before MERRILL and KOELSCH, Circuit Judges and JAMESON,* District Judge.

JAMESON, District Judge:

This appeal is from an order granting summary judgment for defendants-appellees, Chrysler Motors Corporation and J. O. Fisher Corporation (Jim Fisher Motors), in an action by plaintiff-appellant, George L. Stansifer, d/b/a Lakewood Sports Cars, for injunctive. relief and damages, based upon alleged violations of the Federal and Washington State Automobile Dealer's Day in Court Acts, 15 U.S.C. § 1221 et seq.[1] and R.C.W. 46.70.180 et seq.[2]

## Statement of Facts

Based upon the pleadings, depositions, affidavits, and other discovery, the relevant facts may be summarized as follows:

On February 1, 1964 Stansifer entered into a written dealer agreement with J. O. Fisher Corporation, then wholesale regional distributor for foreign made Rootes automobiles in the States of Washington and Oregon. On March 15, 1965 a similar agreement was executed with respect to foreign made Simca automobiles. In October, 1965 the J. O. Fisher Corporation was dissolved, and Jim Fisher Motors, a sole proprietorship, became successor to the corporation's business.

In early 1966 Chrysler Corporation acquired controlling interests in the foreign corporations which manufactured Rootes and Simca automobiles. On February 7, 1966, Chrysler Motors Corporation, a wholly owned subsidiary of Chrysler Corporation, entered into written non-exclusive distributor agreements with Jim Fisher Motors under which Fisher was to operate as distributor and wholesaler of Rootes and Simca automobiles in Washington and Oregon. On February 23, 1966 Fisher entered into dealer agreements with Stansifer, ap-

---

\* Honorable W. J. Jameson, United States Senior District Judge for the District of Montana, sitting by designation.

1. This Act provides in pertinent part:
"An automobile dealer may bring suit against any automobile manufacturer engaged in commerce, in any district court of the United States in the district in which said manufacturer resides, or is found, or has an agent, without respect to the amount in controversy, and shall recover the damages by him sustained and the cost of suit by reason of the the failure of said automobile manufacturer from and after August 8, 1956 to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer \* \* \*." 15 U.S.C. § 1222.

2. R.C.W. 46.70.180(7)(a) and (b) provide: "Each of the following acts or practices is hereby declared unlawful:
\*     \*     \*     \*     \*
"(7) Being a manufacturer, distributor, or factory representative or branch to:
"(a) Coerce or attempt to coerce any motor vehicle dealer to order or accept delivery of any motor vehicle or vehicles, parts or accessories, or any other commodities which shall not have been voluntarily ordered by the said motor vehicle dealer: *Provided*, That recommendation, endorsement, exposition, persuasion, urging, or argument shall not be deemed to constitute coercion;
"(b) Cancel, or, fail to renew the franchise or selling agreement of any motor vehicle dealer *doing business in this state* without fairly compensating the dealer at a fair going business value for his capital investment \* \* \* if \* \* \* [s]aid cancellation or nonrenewal was not done in good faith."

pointing him non-exclusive dealer of Rootes and Simca automobiles in the City of Tacoma, Washington, and Pierce County and vicinity. Stansifer operated under these agreements from 1966 through 1969.

Following negotiations initiated by Fisher, on December 23, 1969 Fisher and Chrysler agreed to terminate Fisher's distributorship, effective December 5, 1969, with Chrysler assuming certain repurchase obligations of Fisher to its dealers and agreeing to indemnify Fisher for losses resulting from claims by Fisher's dealers arising out of Chrysler's failure to reappoint such dealers.

Under the terms of Fisher's dealer agreements, the termination of the relationship between Fisher and Chrysler automatically terminated all of Fisher's dealer agreements, including those with Stansifer.[3] On January 1, 1970, Stansifer received a letter from Fisher notifying him that his "dealer agreements were automatically terminated effective December 5, 1969".

On January 15, 1970 Nigel Burn, Chrysler's import representation manager, and R. J. Ozburn, regional manager of Chrysler-Plymouth, called on Stansifer, presented him with two documents, and requested that he sign one of them. The first was a one-year dealer direct term agreement for the sale of Rootes and Simca automobiles. The second was a letter acknowledging notice of the termination of the Fisher distributor agreements with Chrysler and reading in part:

"On this date, (a) representative(s) of Chrysler Motors Corporation offered this company a twelve (12) month Term Sales Agreement for the purpose of allowing us time during which to qualify for regular *Simca* (and) *Rootes* Dealer Agreements with Chrysler Motors Corporation.

"This letter is to advise you that, upon consideration, we hereby decline the opportunity to qualify for *Simca* (and) *Rootes* Dealer Agreements with you."

Stansifer declined to sign either agreement.[4] This action was filed on February 3, 1970.

### Proceedings in District Court

Appellant's complaint alleged violations of the Federal and Washington State Dealer's Day in Court Acts, based upon his version of what occurred during the January 15 negotiations with the Chrysler representatives. Specifically he alleged that the "defendants conspired to unlawfully terminate [his] non-exclusive dealership", attempted to coerce him to accept unwanted automobiles, threatened to cancel his dealership if he refused to accept the unwanted automobiles, and threatened to refuse to compensate him for his capital investment in new cars, equipment, tools and parts.

Separate answers were filed by the defendants, followed by a joint motion for summary judgment of dismissal. In support of the motion Chrysler contended that the absence of a written franchise with Stansifer precluded any recovery under the Federal Dealer's Day in Court Act. Fisher contended that there was no allegation or proof of any

---

3. Paragraph 21 of Stansifer's dealer agreements with Fisher provides that "this Agreement will terminate automatically without notice from either party on: * * * (6) the termination for any reason of DISTRIBUTOR'S Rootes [and Simca] Distributor Agreement with Chrysler Motors Corporation."

4. Stansifer stated in his affidavit that Ozburn told him that under the twelve month dealer-agreement he would be required to purchase eight or nine 1969 model auto-mobiles to bring his inventory to the required minimum; that he "had no desire to purchase 1969 models * * * at a time when Chrysler had already announced the 1970 models were coming out six days later"; and that Ozburn said that if he refused to sign either agreement, "Chrysler would refuse to honor the provisions in [his] dealer agreement relating to the obligation of the distributor to repurchase new cars and parts which [he] had in inventory as of the time of the termination".

wrongdoing on his part and that any wrongdoing on the part of Chrysler's representatives would not be attributable to him. Both appellees argued that under the Washington Act no claim may be stated if a claim under the Federal Act is dismissed with prejudice.

At the close of a hearing on March 12, 1971 the court announced that the defendants' motion for summary judgment would be granted.[5] A formal order was entered June 14, 1971, the court concluding that the claim of appellant "cannot come within the purview of either the federal or state Dealer's Day in Court Act".[6]

### Summary Judgment

Summary judgment of course is proper only where there is no genuine issue of any material fact or where viewing the evidence and the inferences which may be drawn therefrom in the light most favorable to the adverse party, the movant is clearly entitled to prevail as a matter of law.[7] Where, however, "on the basis of the materials presented by his affidavits, the moving party, if at trial, would be entitled to a directed verdict unless contradicted, it rests upon the opposing party at least to specify some evidence to show that such contradiction is possible. * * * The burden of coming forward with specific controverting facts shifts to the opponent. * * * It is his duty to expose the existence of a genuine issue which will prevent the trial from being a useless formality." Doff v. Brunswick Corporation, 372 F.2d 801, 805 (9 Cir. 1967), cert. denied, 389 U.S. 820, 88 S. Ct. 39, 19 L.Ed.2d 71 (1967).[8] In determining whether the summary judgment was proper under these rules we accept the testimony of appellant as set forth in his affidavit and deposition, even though contradicted in part by other testimony.

### Claim against Chrysler under Federal Act

The Automobile Dealer's Day in Court Act (also referred to as The Automobile Dealer's Franchise Act), 15 U.S.C. §§ 1221–1225, created a new cause of action in favor of a franchised automobile dealer against an automobile manufacturer for damages sustained "by reason of the failure of said automobile manufacturer * * * to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise". It is obvious that the Act does not apply until a manufacturer-dealer relationship has been created.

The term "franchise" is defined in 15 U.S.C. § 1221(b) as "the written agreement or contract between any automobile manufacturer engaged in commerce and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such agreement or contract." It is clear that without a written franchise there can be no claim or cause of action under the Act.[9]

5. Subsequently the court by letter invited counsel to bring to his attention any further facts to establish the "straw man" theory upon which appellant relies. Counsel did not respond to the letter.

6. Appellant's motion for reconsideration and/or a new trial and for "entry of findings of fact, conclusions of law and judgment" was denied.

7. See Consolidated Electric Co. v. United States, 355 F.2d 437, 438 (9 Cir. 1966); United States v. Western Electric Co., 337 F.2d 568, 572 (9 Cir. 1964); 6 Moore's Federal Practice, para. 56.15(3) (1972).

8. See also First Nat. Bank v. Cities Service, 391 U.S. 253, 288, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Town House, Inc. v. Paulino, 381 F.2d 811, 814 (9 Cir. 1967).

9. See, e. g., Reliable Volkswagen v. World-Wide Auto, 216 F.Supp. 141 (D.N.J.1963); Alfieri v. Willys Motors, Inc., 227 F.Supp. 627 (E.D.Pa.1964); Lawrence Chrysler Plymouth, Inc. v. Chrysler Corp., 461 F.2d 608, 613 (7 Cir. 1972); York Chrysler Plymouth, Inc. v. Chrysler Credit Corporation, 447 F.2d 786, 791 (5 Cir. 1971).

There was no written agreement between Chrysler and Stansifer. The written agreements were between Chrysler as manufacturer and Fisher as distributor and between Fisher as distributor and Stansifer as dealer. Nor is there any evidence that Chrysler had any direct dealings with Stansifer prior to the termination of the dealer agreement between Fisher and Stansifer.

■ Appellant contends that Fisher was a "straw man" or agent of Chrysler, and that the agreements between Fisher and Stansifer were in fact between Chrysler and Stansifer. It is true, as appellant argues, that Chrysler could not "avoid requirements of the Dealer Franchise Act relating to manufacturers by merely setting up a 'straw man' between it and the dealer and then stating that it had no franchise with any dealer * * *." [10] The district court found as a matter of law, however, that "the facts in this case in no way support a claim that Jim Fisher was a straw man or an agent of the Chrysler Motors Corporation * * *." We agree.

### Was Fisher the Agent of Chrysler?

Restatement of the Law of Agency, 2d (1958) defines "agency" in § 1 as follows:

"Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act."

This definition of agency has been accepted and followed by the Supreme Court of Washington in numerous cases, including McCarty v. King County Medical Service Corp., 26 Wash.2d 660, 175 P.2d 653, 664 (1946), where the court

emphasized that control of the conduct of the agent is "the vitally essential element in the relationship of principal and agent".[11]

§ 14 J of the Restatement relating to "Agent or Buyer" reads:

"One who receives goods from another for resale to a third person is not thereby the other's agent in the transaction: whether he is an agent for this purpose or is himself a buyer depends upon whether the parties agree that his duty is to act primarily for the benefit of the one delivering the goods to him or is to act primarily for his own benefit."

§ 15 of the Restatement relating to "Manifestations of Consent" reads:

"An agency relation exists only if there has been a manifestation by the principal to the agent that the agent may act on his account, and consent by the agent to act."

Paragraph 24 of the distributorship agreements between Chrysler and Fisher reads in part:

### "DISTRIBUTOR IS NOT AGENT

"This Agreement does not create the relation of principal and agent between MOTORS and DISTRIBUTOR, and under no circumstances is either party to be considered the agent of the other."

■ Appellant contends that notwithstanding this express provision in the distributorship agreements, other provisions of the agreements and the conduct of the parties under the agreements manifest the control necessary to establish an agency, and that in effect Fisher was merely a "straw man" in a franchise

---

10. See Barney Motor Sales v. Cal Sales, Inc., 178 F.Supp. 172, 175 (S.D.Cal.1959) and Volkswagen Interamericana, S. A. v. Rohlsen, 360 F.2d 437, 441 (1 Cir. 1966). Although these cases hold merely that a distributor can be a "manufacturer" under the Federal Act, they do suggest, as the district court recognized, "that a distributorship contract between a manufacturer of automobiles and certain distributors and a contract between a distributor and a dealer would not bar an action by a dealer against the manufacturer if it appears that the distributor was in fact a straw man or an agent of the manufacturer."

11. See also Turnbull v. Shelton, 47 Wash. 2d 70, 286 P.2d 676, 677 (1955).

agreement between Chrysler as manufacturer and Stansifer as dealer.

In resolving this question it may be noted at the outset that J. O. Fisher Corporation became wholesale regional distributor for Rootes automobiles in 1958, over seven years prior to Chrysler acquiring control of (or any interest in) the foreign corporation which manufactured Rootes automobiles. The Fisher Corporation entered into dealer agreements with Stansifer for Rootes automobiles in February, 1964 and for Simca automobiles in March, 1965. The distributorship agreements between Chrysler and Fisher and the dealer agreements between Fisher and Stansifer were not executed until February, 1966.

In contending that Chrysler reserved substantial control over the dealer's method of operation, appellant relies upon provisions in the distributorship agreements that (1) the form of dealership agreements would be furnished to Fisher by Chrysler; (2) Fisher was obliged to use these forms in appointing dealers; (3) Chrysler could terminate the distributorship if sales volume was insufficient; (4) Chrysler could veto prospective appointments of dealers; (5) Fisher's method of distribution and location of dealers was subject to the approval of Chrysler; (6) Chrysler could give directives to Fisher's dealers, and Fisher agreed to enforce compliance; and (7) Chrysler required Fisher to maintain minimum inventories of parts and automobiles.

It is clear from the testimony of J. O. Fisher, Jr., which is uncontradicted, that in conformity with the distributorship agreements Fisher purchased the automobiles and parts from Chrysler, obtained title thereto, could resell at wholesale to any automobile dealer or to any person at retail, could resell at any price, and dealt with its purchasers in its own name. Fisher could decide which dealers to appoint if the prospective dealer had the necessary capital requirements, facilities and services. Fisher assumed the credit risks for any automobiles it sold, at wholesale and retail, and carried liability insurance for various risks of loss.

Contractual provisions of the type here involved are not uncommon. In construing similar contracts the courts have held consistently that controls of the kinds reserved by Chrysler do not create a relationship of agency, but rather one of buyer and seller. The leading case, cited in numerous subsequent cases, is S. B. McMaster, Inc. v. Chevrolet Motor Co., 3 F.2d 469 (E.D.S.C.1925), where the contractual provisions in a manufacturer-dealer contract were essentially the same as the provisions of the distributorship agreements upon which appellant relies.[12] Recognizing that the two distinctive elements of an agency relationship are that (1) the agent acts on behalf of his principal and (2) the agent has the power to bind the principal (3 F.2d at 474), the court held that the acts which the dealer performed were not the acts of the seller (manufacturer) nor for the seller, but his own acts and for himself, and that the contract contained no provision authorizing the dealer to bind the seller.[13] The

---

12. Most of the terms of the contract in *McMaster* are identical to those which Stansifer argues create an agency relationship between Chrysler and Fisher. For example, in *McMaster* the dealer contracted with had the power to appoint associate dealers, but the appointments could be vetoed by the manufacturer; the appointment of associate dealers was to be made on printed forms supplied by the manufacturer; the dealer was obliged to maintain a place of business, a sales room, and service station satisfactory to the manufacturer; the dealer was required to carry a stock of new repair parts, in an amount and of such kind as determined by the manufacturer; and the dealer was required to comply with the manufacturer's directions relating to advertising, sale, and servicing of new automobiles and parts.

13. The court said further:

"As I view this contract, the case is simply this: The manufacturer desires to sell his products in such manner only that his interests may be promoted. He therefore demands as a part of the price in the making of the contract that the person

same is true of the provisions of the distributorship agreements upon which appellant relies.[14] The district court correctly held as a matter of law that no agency relationship was created by the distributorship agreements between Chrysler and Fisher, and that Fisher was not a "straw man" for Chrysler.

### Claim against Fisher under Federal Act

Appellant contends that in the January 15, 1970 negotiations with Stansifer the Chrysler representatives were acting as Fisher's agent "pursuant to the indemnity agreement". He relies upon the provisions in the agreement terminating the Chrysler-Fisher agreement whereby Chrysler agreed to assume Fisher's repurchase obligations to Fisher's dealers and to indemnify Fisher for any losses resulting from Chrysler's failure to reappoint the dealers.

Appellant has presented no proof or authority in support of this rather novel theory of agency.[15] Clearly the repurchase obligations and indemnity provisions would not in themselves establish an agency. Fisher did not participate in the January 15 negotiations between Chrysler representatives and Stansifer and did not discuss those negotiations at any time with any Chrysler representative.[16] Nor did Fisher or his agents participate in any repurchase by Chrysler of automobiles and parts.[17]

From an examination of the entire record we find no evidence to support appellant's contention that Chrysler was acting as Fisher's agent.

Appellant also alleged in his complaint that appellees "conspired to wrongfully terminate plaintiff's non-exclusive dealership". No proof was offered to support this claim. The deposition of J. O. Fisher, Jr., taken at the instance of appellant, shows that Fisher initiated the termination of his distributorship, that the motive for termination was Fisher's inability to sell and distribute Rootes and Simca automobiles at a profit, and that there was no intention to harm Stansifer. The district court properly concluded that "There is absolutely no evidence in the record to show that this termination resulted from any compulsion by the manufacturer, but was purely a voluntary arrangement prompted by Fisher's desire to end the arrangement which he contended was not to his financial benefit."

In the absence of proof that Chrysler was acting as Fisher's agent or other evidence of any wrongdoing on the part of Fisher, there is no basis for recovery from Fisher.

### Claims under State of Washington Act

R.C.W. 46.70.190 provides that "Any person * * * whose claim has been dismissed with prejudice under said

---

to whom he sells his goods shall submit to certain restrictions. The person desiring to buy the manufacturer's goods is anxious to purchase them, and in order to purchase them is willing to submit to the conditions and restrictions named. A consideration of the whole contract and all its terms shows that the parties were studiously careful to make a contract of sale and not a contract of agency. They certainly had a right to do this, and if that was their real intention it is the duty of this court to give effect to that intention." 3 F.2d at 475.

14. Cases involving distributorship agreements where the court cited and followed *McMaster* include Jeffrey-Nichols Motor Co. v. Hupp Motor Car Corporation, 41 F.2d 767, 773 (D.Mass.1930) and Quijada Corp. v. General Motors Corp., 253 A.2d 538 (D.C.Ct. App.1969).

15. In his affidavit Stansifer states that the two Chrysler representatives "were acting both on behalf of Chrysler and on behalf of Jim Fisher Motors under the indemnity agreement". However, this mere legal conclusion, unsupported by sepecific facts which support Stansifer's theory of agency, is not sufficient to raise an issue of material fact. "More is required from an affiant than mere * * * legal conclusion." *Doff, supra* at 804 of 372 F.2d.

16. Fisher testified that "once we signed our termination with the factory as a distributor I was not concerned with what they were doing. That was their business then and not mine, so I didn't really pursue it." He knew nothing of what transpired at the January 15 meeting except what he heard from Stansifer.

17. Fisher testified that "We remained out of it. We were not involved."

Federal Automobile Dealer Franchise Act shall have no cause of action under this section for alleged violation of RCW 46.70.180(5)(b) * * *." [18] It is clear accordingly that any claims arising under 46.70.180(7)(b) relating to the cancellation or failure to renew the "franchise or selling agreement" are barred by the dismissal with prejudice of the claims under the Federal Act.

Appellant contends also that appellees violated R.C.W. 46.70.180(7)(a) in that they "endeavored to coerce appellant into ordering Simca and Rootes motor vehicles which he did not wish to order". This contention was not argued further in appellant's brief or orally and was not referred to in either the district court's memorandum decision or appellee's brief.

Under 46.70.180 "Each of the following acts or practices is hereby declared unlawful: * * *

"(7) Being a manufacturer, distributor, or factory representative or branch to:

"(a) Coerce or attempt to coerce any motor vehicle dealer to order or accept delivery of any motor vehicle or vehicles * * * which shall not have been voluntarily ordered by the said motor vehicle dealer."

While subdivision (7)(a) makes no express reference to a franchise agreement, as do the Federal Act and subdivision (7)(b), it is clear that it relates to acts of a manufacturer or distributor with respect to an existing agreement with a dealer.[19] Here, however, the dealer agreements between Fisher and Stansifer, as well as the distributor

agreements between Chrysler and Fisher, had terminated prior to the alleged coercion.[20] Accepting as true Stansifer's statements relative to his negotiations with Chrysler's representatives on January 15, 1970, the requirement for the purchase of additional cars was a condition for a new direct dealer agreement between Chrysler and Stansifer rather than attempted coercion with respect to an existing dealer agreement.[21]

Viewing the evidence and the inferences to be drawn therefrom in the light most favorable to appellant, the district court was correct in holding as a matter of law that appellant "cannot come within the purview of either the federal or state Dealer's Day in Court Act".

Affirmed.

---

18. This obviously refers to 46.70.180(7)(b), quoted in Note 2. R.C.W. 46.70.180 was amended in 1969 and former subdivision (5) was renumbered (7). A corresponding amendment was not made in 46.70.190.

19. Appellant couples his claim of attempted coercion with his claim that appellees wrongfully "cancelled and failed to renew his dealer agreement".

20. As noted *supra*, the dealer agreement between Fisher and Stansifer expressly provided

that it would automatically terminate upon termination of the distributor agreement between Chrysler and Fisher.

21. Appellant complains further that the Chrysler representatives told him Chrysler would refuse to honor the repurchase obligation if appellant did not sign one of the offered agreements. There is no evidence, however, that Chrysler in fact failed to comply with this obligation, which it assumed in the agreement terminating the Fisher distributorship.