**Apolinar NAVARETTE, Jr., aka Paul Medel Navarette, Plaintiff-Appellant,**

v.

**Jiro J. ENOMOTO,\* et al., Defendants-Appellees.**

No. 74–2212.

United States Court of Appeals, Ninth Circuit.

Feb. 9, 1976.

Rehearing and Rehearing En Banc Denied July 29, 1976.

---

\* During the pendency of this appeal, the appellee Raymond K. Procunier, as Director of the Department of Corrections of the State of California, was succeeded in that office by Jiro J.

Enomoto. To reflect this change, the said Jiro J. Enomoto is substituted as one of the appellees in this action, and the caption of the proceeding is amended accordingly.

Michael E. Adams, of La Casa Legal De San Jose Project, San Jose, Cal., for plaintiff-appellant.

Evelle J. Younger, Atty. Gen., San Francisco, Cal., for defendants-appellees.

## OPINION

Before KOELSCH and HUFSTEDLER, Circuit Judges, and HILL,** District Judge.

KOELSCH, Circuit Judge:

Appellant Navarette, a California state prisoner, brought this civil rights action against state prison officials under 42 U.S.C. §§ 1983, 1985 and 28 U.S.C. §§ 1341, 1343; his complaint set out nine purported claims. The district court granted summary judgment for appellees as to the first, second, and third and dismissed the fourth through ninth for failure to state a federal claim. We affirm in part and reverse in part.

The district court erred in its grant of summary judgment. As to claims one and two, Navarette's allegations in substance were that appellees deliberately refused to mail certain of his letters and to send certain others by registered mail in violation of the federal constitution and the mail regulations then in effect.

The controlling standard, first enunciated by the Supreme Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), is that an action may be dismissed for failure to state a claim only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Although the amended complaint drafted by Navarette's attorney is badly worded and is not entitled to application of the "less stringent" standards reserved for *pro se* pleadings (*Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)) we nevertheless view the allegations as sufficient to state a claim for the violation of a first amendment right to free expression.

In *Martinez v. Procunier,* 354 F.Supp. 1092 (N.D.Cal.1973), a case involving the censorship of prisoners' mail pursuant to state prison regulations, a three-judge district court enjoined enforcement of those regulations, holding "that prisoners' right to correspond is a fundamental right protected by the First Amendment, and that restrictions on that right must be at least reasonably and necessarily related to a valid institutional interest . . . ." 354 F.Supp. at 1097. Reviewing that decision in *Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1973), the Supreme Court affirmed on the narrower basis that unjustified governmental interference with the intended communications violated the first amendment rights, not of the prisoners, but of the non-prisoner correspondents who were party to those intended communications; the Court specifically reserved the question to what extent "an individual's right to free speech survives incarceration . . . ." 416 U.S. at 408, 94 S.Ct. at 1809.

Nevertheless, this court has indicated in at least two recent decisions that a prisoner does not shed his first amendment right to free expression upon entering the prison gates. *See McKinney v. DeBord,* 507 F.2d 501, 505 (9th Cir. 1974) (opin. of Choy, J.); *Seattle-Tacoma Newspaper Guild, Local # 82 v. Parker,* 480 F.2d 1062, 1065 (9th Cir. 1973). Relying on the language in these decisions and our essential agreement with the rationale of the three-judge court in *Martinez,* we think Navarette's allegations, although inartfully worded, permit proof entitling him to relief.[1]

However, the district court's grant of summary judgment would have been appro-

---

** The Honorable Irving Hill, United States District Judge for the Central District of California, sitting by designation.

1. We express no opinion as to whether Navarette's allegations of mail interference may state a claim for deprivation of his right to counsel or of access to the courts, *see Ex parte Hull,* 312 U.S. 546, 548–549, 61 S.Ct. 640, 85 L.Ed. 1034 (1941); *Christman v. Skinner,* 468 F.2d 723 (2d Cir. 1972); *Sostre v. McGinnis,* 442

F.2d 178 (2d Cir. 1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972); of his right to equal protection of the laws, *see Smith v. Schneckloth,* 414 F.2d 680, 681 (9th Cir. 1969); or of his fourth amendment rights, *see United States v. Savage,* 482 F.2d 1371, 1373 (9th Cir. 1973). *Cf. Wolff v. McDonnell,* 418 U.S. 539, 575–577, 94 S.Ct. 2693, 41 L.Ed.2d 935 (1974).

priate if there were no genuine issue of any material fact or, viewing the evidence and the inferences which may be drawn therefrom in the light most favorable to the adverse party, the movant were clearly entitled to prevail as a matter of law. *Stansifer v. Chrysler Motors Corporation,* 487 F.2d 59, 63 (9th Cir. 1973).

In that regard, appellees argue that summary judgment was proper on the ground that a reasonable and good faith belief of a state official that his or her conduct is lawful, even where in fact it is not, constitutes a complete defense to a § 1983 claim for damages.

■ True, the existence of a public officer's "good faith" immunity from § 1983 liability has been recognized in a number of situations. *See Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214, 43 U.S.L.W. 4293 (Feb. 25, 1975); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Pierson v. Ray,* 386 U.S. 547 (1967); *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). *See also Williams v. Gould,* 486 F.2d 547, 548 (9th Cir. 1973); *Handverger v. Harvill,* 479 F.2d 513, 516 (9th Cir. 1973); *Wimberley v. Campoy,* 446 F.2d 895, 896 (9th Cir. 1971); *Notaras v. Ramon,* 383 F.2d 403, 404 (9th Cir. 1967). But here appellees' assertions that they acted in the good faith belief that they were complying with valid regulations are contradicted by Navarette's affidavits. This raised an issue of fact and precluded summary judgment. *See Wimberley, supra,* 446 F.2d at 896.[2] Moreover, the district court may not assume that the defense of good faith is always available. In *Williams v. Gould,* 486 F.2d 547, 548 (9th Cir. 1973), we said that "[g]ood faith is a defense to liability for damages in a suit under section 1983—at least if, and to the extent that, it would be a defense '[u]nder

the prevailing view in this country' in common-law actions based on the parallel tort [*citing Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)]." And in *Wood v. Strickland, supra,* the Supreme Court concluded that § 1983 should be construed to accord school board members a qualified good faith immunity from damages under that section where "common-law tradition" and "strong public-policy reasons" so dictate. 420 U.S. at 320, 95 S.Ct. at 1000. On remand, the district court should determine whether the defense of good faith is available in this action in respect of causes one and two.

■ The dismissal of claims four and five was error. The substance of those claims was that Navarette was removed as prison librarian and a law-student visitation program in which he participated was terminated solely to punish or hamper his legal activities. The termination or denial of prison privileges because of a prisoner's legal activities on his own behalf or those of other inmates is an impermissible interference with his or her constitutional right of access to the courts. *See Hooks v. Kelley,* 463 F.2d 1210, 1211 (5th Cir. 1972); *Christman v. Skinner,* 468 F.2d 723, 726–727 (2d Cir. 1972). Hence the allegations concerning the removal of Navarette as librarian constituted a valid claim. Similarly, the termination of the law-student visitation program may well have had the effect of impermissibly burdening Navarette's right of access to the courts. *See Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971), *affirming Gilmore v. Lynch,* 319 F.Supp. 105 (N.D.Cal.1970); *Procunier v. Martinez, supra,* 416 U.S. at 419–422, 94 S.Ct. 1800; *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *Ex parte Hull,* 312 U.S. 546, 61 S.Ct. 640, 85 L.Ed. 1034 (1941).[3]

---

**2.** The existence or lack of good faith—a state of mind which is therefore a subjective fact—generally is not the type of issue that lends itself to resolution, on the basis of affidavits, by summary judgment.

**3.** We need not consider whether the alleged termination of the librarianship or the law-stu-

dent visitation program might constitute a sufficiently significant invasion of Navarette's liberty or property interests requiring the procedural safeguards outlined in *Clutchette v. Procunier,* 497 F.2d 809, 510 F.2d 613 (9th Cir. 1974).

The district court also erred in granting summary judgment as to the third claim and in dismissing the sixth. The allegations in claim three are to the effect that the acts charged in claims one and two were committed negligently; and such was also the gravamen of the sixth with respect to the acts charged in claims four and five.

In *Williams v. Field,* 416 F.2d 483, 485 (9th Cir. 1969), *cert. denied,* 397 U.S. 1016, 90 S.Ct. 1252, 25 L.Ed.2d 431 (1970), we recognized that it was still an open question in this circuit whether a negligent act can give rise to § 1983 liability. Since then, we have twice noted the issue without deciding it. *See Allison v. Wilson,* 434 F.2d 646, 647 (9th Cir. 1970), *cert. denied,* 404 U.S. 863, 92 S.Ct. 43, 30 L.Ed.2d 107 (1971); *Cockrum v. Whitney,* 479 F.2d 84, 86 n. 1 (9th Cir. 1973).

Section 1983 creates a federal cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." The section places no narrow limitation on the nature or quality of the conduct which it makes actionable, but concerns itself entirely with the consequences of that conduct. Moreover, the Court indicated in *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961), that § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Reading the statute in the prescribed fashion, we believe that a deprivation of rights need not be purposeful to be actionable under § 1983. *Cf. Cohen v. Norris,* 300 F.2d 24 (9th Cir. 1962) (in banc).[4]

Of course we do not imply that all tortious conduct engaged in by a public official acting under color of state law is subject to redress under § 1983. A § 1983 plaintiff must show that he has been deprived of a federally protected right by reason of that conduct. In the specific context involved here—the administration of state prison systems—federal courts have traditionally been loathe to intervene absent unusual circumstances,[5] and hence the extent to

---

**4.** Other circuits are in essential agreement. *See, e. g., Hoitt v. Vitek,* 497 F.2d 598, 602 n. 4 (1st Cir. 1974); *Howell v. Cataldi,* 464 F.2d 272, 279 (3d Cir. 1972); *McCray v. Maryland,* 456 F.2d 1, 5–6 (4th Cir. 1972); *Jenkins v. Averett,* 424 F.2d 1228, 1232–1233 (4th Cir. 1970); *Parker v. McKeithen,* 488 F.2d 553, 556 (5th Cir. 1974), *cert. denied,* 419 U.S. 838, 95 S.Ct. 67, 42 L.Ed.2d 65 (1974); *Roberts v. Williams,* 456 F.2d 819 (5th Cir. 1971), *cert. denied,* 404 U.S. 866, 92 S.Ct. 83, 30 L.Ed.2d 110 (1971); *Whirl v. Kern,* 407 F.2d 781, 787–789 (5th Cir. 1969), *cert. denied,* 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177 (1969); *Fitzke v. Shappell,* 468 F.2d 1072, 1077 (6th Cir. 1972); *Puckett v. Cox,* 456 F.2d 233, 234–235 (6th Cir. 1972); *Spence v. Staras,* 507 F.2d 554, 557 (7th Cir. 1974); *Byrd v. Brishke,* 466 F.2d 6, 10–11 (7th Cir. 1972); *Joseph v. Rowlen,* 402 F.2d 367, 369–370 (7th Cir. 1968); *Dewell v. Lawson,* 489 F.2d 877, 881–882 (10th Cir. 1974); *Daniels v. Van De Venter,* 382 F.2d 29, 31 (10th Cir. 1967); *Stringer v. Dilger,* 313 F.2d 536, 540–541 (10th Cir. 1963); *Carter v. Carlson,* 144 U.S.App.D.C. 388, 447 F.2d 358, 365 (1971), *reversed on other grounds,* 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973). *But cf. Brown v. United States,* 486 F.2d 284, 287–288 (8th Cir. 1973).

**5.** This circuit, like others, *see, e. g., Parker v. McKeithen,* 488 F.2d 553, 556 (5th Cir. 1974); *Sostre v. McGinnis,* 442 F.2d 178, 191 (2d Cir. 1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972), has traditionally been reluctant to interfere in matters of state prison administration. *See Williams v. Field, supra,* 416 F.2d at 485. *See, e. g., Mayfield v. Craven,* 433 F.2d 873 (9th Cir. 1970); *Smith v. Schneckloth,* 414 F.2d 680 (9th Cir. 1969); *Stiltner v. Rhay,* 371 F.2d 420 (9th Cir. 1967), *cert. denied,* 387 U.S. 925, 87 S.Ct. 2038, 18 L.Ed.2d 977, 389 U.S. 964, 88 S.Ct. 352, 19 L.Ed.2d 378 (1967); *Snow v. Gladden,* 338 F.2d 999 (9th Cir. 1964); *Weller v. Dickson,* 314 F.2d 598 (9th Cir. 1963), *cert. denied,* 373 U.S. 930, 83 S.Ct. 1551, 10 L.Ed.2d 701 (1963). *But see Riley v. Rhay,* 407 F.2d 496 (9th Cir. 1969).

Nevertheless, as noted in *Parker v. McKeithen, supra,* 488 F.2d at 556, "it can no longer be correctly asserted that the federal courts are unwilling in all situations to review the actions of state prison administrators to determine the existence of possible violations of constitutional rights." In this context, *see Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), at 555–556 (opinion of the Court) and 593–601 (Douglas, J., dissenting in part).

which many federal rights held by ordinary citizens survive incarceration is as yet uncertain. *Cf. Wolff v. McDonnell,* 418 U.S. 539, 555–556, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Nevertheless, here the prisoner's rights which Navarette alleges to have been violated are fundamental and reasonably well-defined; his allegations that state officers negligently deprived him of those rights state a § 1983 cause of action.[6]

■ The district court did not err in dismissing claims seven, eight, and nine. In them, Navarette sought to predicate the liability of defendants Procunier, Stone, and Morris, not on a theory of personal liability, but rather on the doctrine of *respondeat superior.* This court has recognized that, in appropriate circumstances, the Civil Rights Act does contemplate the imposition of vicarious liability where such liability is authorized by state law. *See Hesselgesser v. Reilly,* 440 F.2d 901, 903 (9th Cir. 1971); 42 U.S.C. § 1988. *See also Hansen v. May,* 502 F.2d 728, 730 (9th Cir. 1974); *Boettger v. Moore,* 483 F.2d 86, 87 (9th Cir. 1973). But here the State of California specifically precludes the imposition of such liability by statute. *See* Cal.Gov.Code § 820.8.[7] *Cf.* the Supreme Court's reading of *Hesselgesser* in *Moor v. County of Alameda,* 411 U.S. 693, 704 n. 17, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973).

■ All nine claims, so far as they purported to be predicated upon 42 U.S.C. § 1985, were properly dismissed. Navar-

ette's pleadings and affidavits failed sufficiently to allege the existence of the conspiracy contemplated by that section. *See, e. g. Griffin v. Breckenridge,* 403 U.S. 88, 102–103, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971); *Sykes v. State of California,* 497 F.2d 197, 200 (9th Cir. 1974); *Granville v. Hunt,* 411 F.2d 9, 11 (5th Cir. 1969).

Affirmed in part, reversed in part, and remanded.

HILL, District Judge (concurring in part and dissenting in part).

I concur in the majority opinion except as it relates to the Fourth and Fifth Claims. I would affirm the trial court's dismissal of those causes of action for failure to state a federal claim. I cannot agree either with the characterization of those claims as contained in the majority opinion or with the statements of law made by the majority concerning them. Since the two causes of action allege the same acts in identical language, both will be hereinafter referred to as "the claim." [1]

The majority opinion asserts that the substance of the claim is that Navarette was removed as prison librarian, and that the Stanford law student visitation program in which he participated was terminated, "solely to punish or hamper his legal activities." I submit that this is not a correct statement of the substance of the claim. I quote in full the operative paragraphs of the complaint in the footnote.[2]

---

**6.** Summary judgment as to the third cause of action was improper because, as in the case of counts one and two, viewing the evidence in the light most favorable to Navarette, we are unable to say appellees are entitled to prevail as a matter of law.

**7.** The "Legislative Committee Comment—Senate," which follows § 820.8, provides in part: "This section nullifies the holdings of a few old cases that some public officers are *vicariously liable* for the torts of their subordinates." (Emphasis in original.)

**1.** The majority treat the Fourth and Fifth Causes of Action as involving the same legal questions and I agree that they should be so treated. Both claims allege exactly the same actions in identical language except that the Fourth Claim characterizes the actions as having been "delib-

erately perpetrated . . . in a knowing disregard of plaintiff's constitutional rights . . ." and in the Fifth Claim as being undertaken "in bad faith disregard of plaintiff's constitutional rights . . . [defendants' lacking] probable cause to believe that plaintiff's legal activities thereby interfered with were unprotected . . ." by the U. S. Constitution.

**2.** "II

For approximately three months during the fall of 1971, plaintiff held the position of prison law librarian at Soledad, during which time his heightened access to library facilities enabled plaintiff, in addition to fully performing his duties as librarian, to pursue his own legal self-education, and as a consequence, to prepare semi-adequate writs and pleadings in ap-

The claim begins by alleging that plaintiff held the position of prison law librarian for three months during the fall of 1971. It says that the position was advantageous to him because the increased access to library facilities enabled him to "pursue his own legal self-education" and, in consequence thereof, to prepare writs and pleadings in 12 different cases for himself and others. Late in *1971,* the complaint says, plaintiff's position was "abruptly" taken from him. No separate statement of the defendant's alleged intent or purpose in taking the librarian position away from the plaintiff is made.

The claim then goes on to describe the Stanford law student visitation program and its termination. This act is obviously not related in time to the removal of plaintiff as law librarian. The complaint says that the student visitation program commenced in *February 1972* and was terminated in fall of that year. Plaintiff says that he benefitted from the program because the advice and assistance he received from the students "had begun significantly to educate" him "and thus to facilitate greatly the large number of legal actions" which he had been seeking to bring for himself and others. The termination of the program as alleged was obviously a total termination of it for the entire prison; no other fair read-

ing of the complaint is possible. Again, the claim contains no separate statement of defendants' alleged intent or purpose in terminating the program. Its termination, said plaintiff, "thwarted" his efforts *"to acquire an adequate fund of legal knowledge* in respect to the legal remedies available to himself and others." (Emphasis supplied). Because the termination impeded his self-education, plaintiff says he was "prevented" from pursuing "in adequate and timely manner" available legal remedies on behalf of himself and others.

In characterizing the intent or purpose of defendants' acts, paragraph V sweeps both apparently unrelated acts together and charges that they were undertaken for the purpose of "thwarting and preventing" plaintiff's acquisition of "knowledge of available remedies . . . ."

What plaintiff has alleged, at most, is that he was discontinued as prison librarian, and the student visitation program was discontinued in the institution, because plaintiff was becoming such a good lawyer and for the purpose of preventing him from becoming a better one.

The majority opinion reads the complaint as making a claim of interference with plaintiff's right of access to the courts. I do not believe it can be fairly so read. In

proximately twelve different cases, on behalf of himself and others.

"III

Starting on or about February, 1972, a small number of Stanford law students, all of whom were ac redited for supervised practice, were permitted by the Department of Corrections to visit inmates at Soledad for the purpose of discussing the legal needs and problems of such inmates. Said law students at all times conducted themselves reasonably in connection with such interviews and in no respect abused the privileges under said program. The legal advice and assistance which Plaintiff received as a result of such law students interviews had begun significantly to educate plaintiff, and, as a consequence thereof, to facilitate greatly the large number of legal actions, including the within action, which Plaintiff had been seeking to bring in order to obtain judicial relief both for himself and others.

"IV

Late in 1971, defendna ts STONE and MORRIS, both individually and in concert together,

abruptly changed plaintiff's job position, and as a proximate result thereof, plaintiff's access to legal books and materials in said library was substantially curtailed. Moreover, in fall, 1972, said defendants, both individually and in concert together, also terminated the visitation program described in the immediately preceding paragraph, and, as a proximate result thereof, thereby thwarted plaintiff's efforts to acquire an adequate fund of legal knowledge in respect to the legal remedies available to himself and others. In direct consequence of both actions by said defendants as described in the within paragraph, *plaintiff was prevented from* pursuing in adequate and timely manner, available legal remedies on behalf of himself and others.

"V

Defendants STONE and MORRIS deliberately perpetrated the actions hereinabove described for the purpose of thwarting and impeding plaintiff's acquisition of knowledge of available legal remedies, and did so in knowing disregard of plaintiff's constitutional rights."

paragraph VII, plaintiff describes the constitutional rights of which he has been deprived by the acts complained of. He includes free speech and due process. But he makes no claim whatever of denial of access to the courts.[3]

The right of access to the courts has been defined by this court as follows:

". . . access to the court means the opportunity to prepare, serve and file whatever pleadings or other documents are necessary or appropriate in order to commence or prosecute court proceedings affecting one's personal liberty, or to assert and sustain a defense therein, and to send and receive communications to and from judges, courts and lawyers concerning such matters." *Hatfield v. Bailleaux,* 290 F.2d 632, 637 (9th Cir.) *cert. den. sub nom. Bailleaux v. Hatfield,* 368 U.S. 862, 82 S.Ct. 105, 7 L.Ed.2d 59 (1961).

The cases establish that the right of access to the courts includes more than the right to prepare, file and prosecute legal actions.

It has also been said that the right of access to the courts ". . . encompasses all the means a defendant or petitioner might require to get a fair hearing from the judiciary on all charges brought against him or grievances alleged by him." *Gilmore v. Lynch,* 319 F.Supp. 105 (N.D.Cal. 1970) [3-judge court], *aff'd sub nom. Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971).

Among the other related rights which have been held to be necessarily involved in the right of access to the courts are: the right to seek and receive the assistance of lawyers (*Procunier v. Martinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974)), the right to the assistance of knowledgeable

inmates (*Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969)), and the right of access to a reasonably good set of lawbooks (*Gilmore v. Lynch, supra*). Each of those corollary rights made a part of the general right of access is necessarily and directly related to the prosecution of legal actions. The majority opinion here seems to extend the right of access to the courts to the alleged right to a better legal education, the alleged right to continue as prison law librarian and the alleged right to continuation of a law student visitor program. I cannot agree that any of these rights are so necessarily and directly related to the general right of access to the courts that they should be made a part thereof. As to the alleged right to become a better lawyer, to pursue a legal education, this court has specifically said in *Hatfield v. Bailleaux, supra,*

"Inmates have the constitutional right to waive counsel and act as their own lawyers but this does not mean that a non-lawyer must be given the opportunity to acquire a legal education." 290 F.2d at 641.

The statement in the majority opinion that "the termination or denial of prison privileges because of a prisoner's legal activities is an impermissible interference with his or her constitutional right of access to the courts" is unfortunate in two separate respects. First, it equates the indefinite concept of "legal activities" with the right of access to the courts. The term "legal activities" could encompass legal studies unrelated to any specific case or it could encompass the filing and prosecution of an action or it could encompass various activities in between. The term is much too vague and too broad. As stated, I would define access to the courts in the

---

**3.** It should be borne in mind that this plaintiff is no ordinary prisoner pro per litigant. His pleading is both sophisticated and polished. His choice of language would do credit to a top-level private practitioner specializing in civil rights litigation. The pleading indicates a more than adequate knowledge of constitutional law, particularly the Civil Rights Act, and an awareness of the essential elements of different theories of law which can be used, in different counts, to attack the same actions. Plaintiff's claim in paragraph II of having been working on 12 different cases during the period in question seems credible indeed. So this plaintiff is not entitled to the special advantages afforded to semi-literate unknowledgeable prisoners in scanning their pleadings although, in my view, the result would be the same if he were afforded that advantage.

language which this court has previously used in *Hatfield v. Bailleaux,* quoted *supra.* Secondly, it extends the right of access to the courts to activities which are not reasonably related thereto, as aforesaid.

The remainder of my dissent is directed to the following sentence in the majority opinion:

"The termination or denial of prison privileges because of a prisoner's legal activities is an impermissible interference with his or her constitutional right of access to the courts."

I believe that to be much too broad a statement and one which is not supported by the cases cited. *Hooks v. Kelley,* 463 F.2d 1210 (5th Cir. 1972), is a holding by the Fifth Circuit court that a complaint states a § 1983 claim which charges that the petitioner had been transferred from minimum security to medium security status only because of his persistent use of the courts to attack his conviction and to attack prison conditions. This case involves no termination or denial of a privilege. It involves an attempt to punish or discourage access to the courts by imposing more onerous conditions of incarceration.

*Christman v. Skinner,* 468 F.2d 723 (2nd Cir. 1972), is a holding by the Second Circuit that a § 1983 claim is sufficient which charged that plaintiff was prohibited from associating with fellow inmates and was denied gym facilities on an equal basis with other inmates because of, and in retaliation for, his commencement of court litigation against prison officials. This case does involve a privilege but involves the *discriminatory denial* thereof because the prisoner instituted court law suits. A case much like *Christman* is *Andrade v. Hauck,* 452 F.2d 1071 (5th Cir. 1971). It holds that a § 1983 complaint is sufficient which charges that a prisoner was deprived of commissary privileges as punishment for corresponding with the courts. Again, a privilege generally available to all inmates was denied or terminated in a discriminatory manner as punishment for undertaking court actions.

I believe that a more precise statement of the governing rule is that redress is afford-able under § 1983 for the *discriminatory* termination or denial of prison privileges generally available to all inmates, undertaken *because* of the prisoner's exercise of his right of access to the courts. This requirement of discriminatory action is specifically recognized in two cases dealing with prisoners' freedom of religion. *Sostre v. McGinnis,* 442 F.2d 178, 189 (2nd Cir. 1971), *cert. den. sub nom. Sostre v. Oswald,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1971), 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972); *Cooper v. Pate,* 378 U.S. 546, 84 S.Ct. 1733, 12 L.Ed.2d 1030 (1964), and, in my view, should also be applied to the right of access.

If 1 have correctly stated the rule of law, the instant case does not fall within it because the face of the complaint shows no discriminatory denial of privileges. No cause of action is stated even if it be assumed that the acts charged were done solely to get at the plaintiff because he was filing so many cases. But, so to read the complaint would be a forced and unreal reading of it.

In the instant case, the student visitation program was cancelled for the entire prison. There was no discrimination against this particular plaintiff involved. It must be conceded that the prison authorities had the discretion to initiate the program and retained the discretion to terminate it at will. In my view, when the non-discriminatory termination of·a prisonwide privilege is alleged, it does not support a complaint under § 1983.

As to plaintiff's position as prison librarian, it would again have to be conceded that we are again dealing with a prison privilege. Neither the plaintiff nor any other prisoner has a constitutional right either to be selected as prison librarian, or to remain in that position once selected. Only one prisoner at a time may be the law librarian. Surely the prison authorities retain the right to rotate the position among inmates—they may even have the duty to do so. They would also appear to have the right to discontinue the position entirely. If a given prisoner is not selected for the

position, or once given the job is replaced in it by another prisoner, he is not thereby denied a privilege generally available to others. Thus, I would hold that the instant complaint concerning plaintiff's removal from the position does not state a cause of action under § 1983.

I would not require prison authorities to undergo the trial of a court action for the termination of either privilege, first, because neither action is sufficiently related to the right of access to the courts, and, even if it is, neither act involves the discriminatory denial of a prison privilege generally available to other inmates.