Dominic P. DeCANTIS

v.

MID–ATLANTIC TOYOTA DIS-
TRIBUTORS, INC.

Civ. A. No. 73–376–R.

United States District Court,
E. D. Virginia,
Richmond Division.

Feb. 19, 1974.

Walter H. Emroch, Emroch & Hotze, Richmond, Va., for plaintiff.

Robert H. Patterson, Jr., W. Carter Younger, J. Robert Brame, III, McGuire, Woods & Battle, Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiff brings this action charging the defendant, Mid-Atlantic Toyota Distributors, Inc. (hereinafter referred to as MAT), with wrongfully terminating his automobile dealer franchise in violation of the federal Automobile Dealers' Act, 15 U.S.C. §§ 1221–1225. Jurisdiction is attained pursuant to 15 U.S.C. § 1222.[1]

The parties are presently before the Court pursuant to the defendant's mo-

tion to dismiss which, because of the reliance placed on documents and materials outside the pleadings, the Court treats as a motion for summary judgment, Rule 12(b), F.R.Civ.P., which is ripe for disposition.

The essence of the defendant's contention is that the plaintiff has failed to state a claim for which relief can be granted.[2] More specifically, the defendant contends that two prerequisites to relief under 15 U.S.C. § 1222 are lacking in this case:

A. There is no "written" franchise between the plaintiff and the defendant. Cf. 15 U.S.C. § 1222 with 15 U.S.C. § 1221(b). See Lawrence Chrysler-Plymouth, Inc. v. Chrysler Corp., 461 F.2d 608 (7th Cir. 1972); Stansifer d/b/a Lakewood Sports Cars v. Chrysler Motors Corp., 487 F.2d 59 (9th Cir. 1973).

B. The defendant is not an "automobile manufacturer" itself or "under the control of" an automobile manufacturer. Cf. 15 U.S.C. § 1222 with 15 U.S.C. § 1221(a). See York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp., 447 F.2d 786, 791 (5th Cir. 1971).

The Court cannot conclude that the defendant has demonstrated these elements to be lacking.

## I. THE WRITTEN FRANCHISE.

The record reflects that for some time prior to January 31, 1970, the plaintiff had been operating an automobile dealership pursuant to a written franchise from Toyota Motor Distributors, Inc. (hereinafter referred to as TMD), a California corporation, headquartered in Torrence, California. While the matter is not altogether clear, it would appear that TMD was a wholly owned subsidiary of Toyota Motor Co., Ltd. (hereinaft-

1. See, infra, n. 2.

2. While the difference is probably only academic in this case, it is to be noted that the defendant has characterized its motion as one challenging this Court's jurisdiction over the controversy. However, the substance of the defendant's contentions go to the question of whether the plaintiff has brought itself within the remedial provisions of the Act relied upon. It is clear, however, that the Court has jurisdiction, pursuant to 15 U.S.C. § 1222, to adjudicate claims under the Automobile Dealers' Act, 15 U.S.C. §§ 1221–1225. The motion should not, therefore, be properly considered as one challenging the Court's jurisdiction. Cf. Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L. Ed. 939 (1946).

er referred to as TMC, Ltd.), a Japanese manufacturer of automobiles.[3]

During the early months of 1970, TMC, Ltd. of Japan was in the process of transferring its wholesale distribution operations in the plaintiff's geographical area from its subsidiary, TMD, to a purportedly independent middleman, MAT. It appears from the record that this transfer was completed on or about April 1, 1970. It was MAT which ultimately informed the plaintiff on August 1, 1970 that its franchise was "hereby terminated."

### A. Plaintiff's Prior Abandonment?

There is a suggestion in the defendant's brief that some time prior to August 1, 1970, the plaintiff itself had abandoned the franchise by failing to respond to TMD's offer of January 30, 1970 to extend the termination date of the written franchise agreement through April 30, 1970. The contention seems to be that an alleged prior abandonment of the franchise relieved the defendant and all other parties of any potential obligation under the Automobile Dealers' Act. The difficulty with this position is that the record, thus far, does not support a conclusion that the plaintiff had in fact abandoned the franchise.

The original franchise agreement between the plaintiff and TMD was, by its terms, to have expired on January 31, 1970. However, on January 30, 1970, TMD, by correspondence, offered to extend the expiration date to April 30, 1970. This, purportedly, was in order to facilitate the transfer of wholesale distribution operations from TMD to MAT by allowing MAT time to evaluate the performance of the individual dealers and to negotiate its own franchise agreements with those with whom it wished to do so.

In reference to this offer by TMD to extend the agreement then in effect, the defendant states:

Extensive discovery in the two state court suits have (sic) failed to unearth any evidence that plaintiffs ever executed the extension agreement.

Execution of the extension agreement by the plaintiff was to have been accomplished rather informally, by simply endorsing a copy of the letter offering the extension and returning it to the distributor. Whether the plaintiff claims to have endorsed and returned a copy of the letter is not clear. Nevertheless, the Court considers that it is still open to the plaintiff to prove at trial that a return was sent, as the defendant has not clearly shown that the opposite is factual.

Indeed, it may be that whether or not the plaintiff endorsed and returned a copy of the extension offer is irrelevant. The indications in the record are that TMD and the plaintiff continued dealing with one another, subsequent to January 31, 1970, as if the agreement were still fully effective. Admittedly, it is arguable that the extension offer required acceptance as specified therein, and that actual performance by the plaintiff would have been no substitute. However, it is equally arguable that the mode of acceptance specified in the extension offer was not mandatory, or that the requirement of an endorsed return was later modified.

Indeed, based on TMD's correspondence with the plaintiff, by letter on March 23, 1970 and by telegram on March 25, 1970, and based on TMD's letter of February 10, 1970 to the D.C. Department of Motor Vehicles, one fact becomes patently clear: TMD, itself, considered the agreement to have been ex-

---

**3.** This is an assumption made in the absence of evidence to the contra, and solely for the purposes of this motion. The confusion over the matter derives partially from the statement in the defendant's brief that the plaintiff's original agreement was with Toyota Motor Sales, U.S.A., Inc. (hereinafter referred to as TMS), also a California corporation headquartered in Torrence, California, and one which the defendant has identified as a wholly owned subsidiary of TMC, Ltd. of Japan. However, the franchise agreement itself clearly reflects that it was TMD which was the contracting party.

tended to April 30, 1970.[4] It is logical to assume, absent evidence to the contra, therefore, that the plaintiff's assent to the extension was communicated to TMD in some manner acceptable to it.

The Court refrains from deciding the issue at this time, as neither party has fully addressed it and there may be evidence relevant to the issue which could be tendered at trial. The Court will assume, for the purposes of this motion, however, that the agreement between TMD and the plaintiff was extended by mutual agreement through April 30, 1970. Under this assumption it cannot be said, as the defendant seems to suggest, that the plaintiff, itself, was the party which first abandoned the franchise, prior to MAT's decision to "terminate" the arrangement.

**B. Change in Distributors.**

■ The franchise agreement heretofore referred to was with TMD. No written agreement was executed by the defendant MAT. Regardless, the Court considers that, under the appropriate circumstances, the written agreement between the plaintiff and TMD would be sufficient to establish the statutory prerequisite to relief under 15 U.S.C. §§ 1221(b) and 1222, as to MAT.

Obviously, the plaintiff's prior agreement could not have been entered into with MAT, as MAT did not take over TMD's wholesaling operations until April 1, 1970, long after the plaintiff's active agreement with TMD had already been executed. Assuming the substitution of wholesale distributors had not taken place, there is no question but that MAT's predecessor, TMD, would have been liable to the plaintiff, under the Automobile Dealers' Act, for its failure to act in good faith regarding the renewal of plaintiff's franchise. The question therefore becomes whether the

plaintiff's rights, under the Act, should be held to have been cut off by the manufacturer's substitution of wholesale distributors. The Court considers that this, in turn, should depend on whether the ultimate control over dealer relations was in the hands of the manufacturer throughout. Under such a situation, the plaintiff's rights under the Act should not vary depending on the middle man with whom it was technically dealing.

■ This is because the Act's ultimate purpose is to curtail the effects of any coercion and intimidation which automobile manufacturers may be able to impose on their retail dealers by virtue of the manufacturers' superior economic position. See Barney Motor Sales v. Cal Sales, Inc., 178 F.Supp. 172, 175 (S.D.Cal.1959). It makes no difference whether the prohibited tactics are imposed by the manufacturer directly through its own agents, or indirectly through corporate affiliates and organizationally independent, but "controlled" middle men. 15 U.S.C. § 1221(a). See Volkswagen Interamericana, S.A. v. Rohlsen, 360 F.2d 437, 441 (1st Cir. 1966); Barney Motor Sales v. Cal Sales, Inc., *supra*, 178 F.Supp. 175.

There is apparently no dispute that in its relations with its retail dealers, TMD had been "under the control" of its parent manufacturer, as that term is used in 15 U.S.C. § 1221(a). Assuming that MAT could be shown to have been likewise "under the control" of the manufacturer, with respect to its dealer relations, the Court would have to conclude that its failure to act in good faith toward dealers who had entered into franchise agreements with its predecessor would subject it to liability under the Act.

A manufacturer should not be permitted to avoid the continued impact of the Act, *vis a vis* already existing dealer re-

---

4. The defendant's own correspondence with the plaintiff, by memorandum on April 22, 1970, indicates its apparent understanding that the written franchise agreement between the plaintiff and TMD was still fully effective. In light of these various communications with the plaintiff by both TMD and MAT, the Court considers the defendant's present contention that the extension offer was never accepted by the plaintiff as specious.

lationships, by the simple expedient of replacing a subsidiary wholesale distributor with an organizationally independent, but "controlled" middle man. Under the present hypothesis, both are the *alter ego* of the manufacturer for the limited purposes of the Act. *Cf.* Volkswagen Interamericana, S.A. v. Rohlsen, *supra*, at 360 F.2d 441; Barney Motor Sales v. Cal Sales, Inc., *supra*, at 178 F. Supp. 175. Accordingly, the transfer of wholesaling operations from one such entity to the other should be held to be paralleled by a *pro tanto* transfer of existing obligations under the Act. Again, it is the seat of power which the Act is intended to ultimately affect, not the medium through which it is exercised.[5] Volkswagen Interamericana, S.A. v. Rohlsen, *supra*, at 360 F.2d 441; Barney Motor Sales v. Cal Sales, Inc., *supra*, at 178 F.Supp. 175.

To summarize, assuming it be shown that the defendant, MAT, like its predecessor, was "under the control" of TMC, Ltd. of Japan with regard to its dealer relations (See discussion, Part II, *infra*), it would follow that the plaintiff's written agreement with TMD was sufficient to establish the statutory prerequisite to relief under 15 U.S.C. §§ 1221(a), 1222, even as to MAT.

■ The Court emphasizes that it does not question, herein, the unqualified right of an automobile manufacturer to make changes in its channels of distribution for legitimate business reasons. Nor does the decision here interfere with that right. Rather, the result here merely limits the effect of such a change, *vis a vis* dealers' rights under the Automobile Dealers' Act, where the ultimate reins of control over the negotiation and operation of dealer franchises are retained in the manufacturer throughout. On the other hand, assuming it could be shown that the defendant in this case, MAT, was not "under the

control" of TMC, Ltd. of Japan, as that term is used in 15 U.S.C. § 1221(a), that factor alone would be sufficient to take this case out from under the Act. 15 U.S.C. § 1222. See York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp., *supra*, at 447 F.2d 791 (5th Cir. 1971).

The Court has carefully considered the opinion in Stansifer v. Chrysler Motors Corp., *supra*, 487 F.2d 59 (9th Cir. 1973), and were its principles ones enunciated by this Court's Appellate Court no discussion of disagreement would be either appropriate or warranted. It may well be, of course, that the Circuit Court of Appeals for the Fourth Circuit will concur with their learned brothers of the Ninth Circuit, but in absence of such a concurrence, and not being able to conclude that that case was correctly decided, this Court must respectfully decline to follow it.

The situation in Stansifer v. Chrysler Motors Corp., *supra*, while analogous to the situation here in that it also involved a midstream change in the manufacturer's pattern of wholesale distribution, was one where the wholesaling operations had been transferred *from* an organizationally independent, but arguably "controlled," middle man *to* the manufacturer's corporate affiliate. In short, roughly the converse of our instant case. Subsequent to taking over the wholesaling operations, the corporate affiliate refused to renew the plaintiff-dealer's franchise, and the latter brought an action against the corporate affiliate under the Automobile Dealers' Act.

The Court in Stansifer v. Chrysler Motors Corp., *supra*, held that the Act's requirement of a written agreement was lacking, since the plaintiff's written agreement had been with the old, organizationally independent distributor and not with its successor, the defendant. The Court there rejected an argument tending to suggest that the old, organi-

---

5. While it is the manufacturer's power which the Act seeks to ultimately curtail, the Act has clearly been interpreted to give rise to an action against a "controlled" middle man, whether or not the manufacturer itself is also joined. See Barney Motor Sales v. Cal Sales, Inc., *supra*, at 178 F.Supp. 172; Volkswagen Interamericana, S.A. v. Rohlsen, *supra*, at 360 F.2d 437.

zationally independent distributor's obligation of good faith dealing under the Act shifted to its successor. In so doing, the Court in *Stansifer* suggested that, for such a shift in responsibility to have taken place, the relationship between the old, organizationally independent distributor and the corporate affiliate would have to have risen to the level of principal and agent.

The approach taken in Stansifer v. Chrysler Motors Corp., *supra*, in this Court's view, misconceives the nature of the remedy provided under the Automobile Dealers' Act, and, if followed, would effectively remove from the Act's protection all situations involving midstream changes in channels of wholesale distribution. This is a result which this Court does not conceive as having been intended.

In both Stansifer v. Chrysler Motors Corp., *supra,* and the instant case, the plaintiff-dealers had clearly been operating under written franchise agreements prior to the substitution of wholesale distributors. The result here is not to suggest that the successor distributors would necessarily be contractually bound by the terms of their predecessors' dealer agreements, as if they had been principal and agent. *Cf.* Stansifer v. Chrysler Motors Corp., *supra,* at 487 F.2d 64. Rather it is merely to conclude that where the ultimate control over dealer operations remains in the manufacturer throughout, the successor distributor should be held to the same statutory duty toward existing dealers as its predecessor. A dealer's action for breach of that duty is a statutory one and not an action on the contract. See R.A.C. Motors, Inc. v. World Wide Volkswagen, 314 F.Supp. 681, 684 (D.N.J. 1970).

The true issue in cases such as Stansifer v. Chrysler Motors Corp., *supra,* and the instant case, as this Court views it, is not, therefore, whether the statutory requirement of a written agreement has been met. The dealer's agreement with the original distributor is sufficient to establish that ingredient. Rather, the issue is whether the ultimate reins of control over retail dealer operations has remained in the hands of the manufacturer throughout.

Beyond the analysis previously addressed, there is a second theory under which the requirement of a written agreement might be established in this case. It may be that the plaintiff would be able to establish at trial that the parties, in fact, adopted the prior written agreement between the plaintiff and TMD as governing the new relationship between the plaintiff and MAT. MAT's various communications with the plaintiff tend to suggest that this was the case. See the MAT memoranda of April 22, April 30, and May 1, 1970. Under the language in Reliable Volkswagen Sales v. World Wide Auto Corp., 216 F. Supp. 141 (D.C.N.J.1963) the mutual adoption of that prior written agreement may be sufficient to sustain the action.

### C. Time Lag Between Expiration and Termination.

■ Finally, the Court does not consider relevant the time lag between the expiration of the written franchise (as extended) on April 30, 1970 and the ultimate termination of the franchise itself some three months later, on August 1, 1970. First, MAT's memorandum of May 1, 1970, arguably indicates MAT's understanding that the distributor-dealer relationship continued to be governed by the terms of the prior written agreement, even subsequent to the expiration date specified in the extension agreement. See Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556, 563 (2d Cir. 1970).

Moreover, the Automobile Dealers' Act protects against a failure to *renew* a dealer franchise upon the expiration of the written franchise agreement, as well as the midstream cancellation thereof. 15 U.S.C. § 1222. It is understandable that there might be a time lag between the specified expiration of the franchise agreement and the actual decision not to renew the franchise itself. This may entail a period for contemplation and

analysis by the manufacturer or wholesale distributor, and for negotiations between the parties.[6] It is therefore not surprising that a dealer would continue operating under the terms of an agreement which had technically expired, while awaiting the decision as to whether or not the franchise would be continued. Under these circumstances, it would substantially undermine the purposes of the Act to conclude that, because of this time lag, the required written agreement was lacking at such time as the franchise was ultimately terminated and relief was sought. See Autowest, Inc. v. Peugeot, Inc., *supra*, at 443 F.2d 563.

## II. CONTROL BY THE MANUFACTURER.

■ As referenced above, the issue thus far reserved is whether the defendant, MAT, was "under the control" of the manufacturer, TMC, Ltd. of Japan, as that term is used in 15 U.S.C. § 1221(a). More properly, for the purposes of this motion, the question is whether the defendant has sufficiently demonstrated that such control was lacking. The Court concludes that the de-

fendant at this stage has not so demonstrated.

■ The decisions under the Automobile Dealers' Act make clear that control by a manufacturer over its wholesale distributors under 15 U.S.C. § 1221(a) need not be in the form of a corporate affiliation. See *e. g.*, Volkswagen Interamericana, S.A. v. Rohlsen, *supra*, 360 F.2d 441. Nor is it required even that the relationship between the manufacturer and distributor rise to the stature of principal and agent. See, Volkswagen Interamericana, S.A. v. Rohlsen, *supra*.[7] Rather, it is sufficient that the manufacturer has the power, by contract or otherwise, to direct the course of dealing between the wholesale distributor and its retail dealers. *Id.*

In this case, there can be little doubt that the terms of the distributorship agreement between MAT and TMS establish the requisite control over distributor-dealer relations in the manufacturer.[8]

Under Article VI, Paragraph 1, the importer, TMS, had the right to tell the defendant how many dealers it would have and where the dealers would be lo-

---

**6.** See MAT's "Dealer Memorandum" of April 3, 1970, where the defendant itself suggested that it would "probably take many months" to review the individual dealers and decide upon franchise renewals. This was less than a month before the existing written agreements were to expire under the extension agreement.

**7.** Noteworthy in this regard is a statement contained in the House Report on this Act, when its passage was being considered:

"Included in the definition of an automobile manufacturer is a concern which acts for 'and is under control of' the manufacturer in connection with the distribution of automotive vehicles. The quoted language has been added by the committee to make it clear that the manufacturer is liable only for his own 'coercion, intimidation, or threats of coercion or intimidation' or the acts of agents *or* distributors subject to his control." 3 U.S.Code Congressional and Administrative News, 1956, 84th Congress, 2d Session, p. 4601. (emphasis added)

The use of alternatives in the report clearly implies that the extended definition of "man-

ufacturer" in 15 U.S.C. § 1221(a) was intended to go beyond the inclusion of legally defined agents.

The defendant's reliance on Stansifer v. Chrysler Motors Corp., *supra*, 487 F.2d 59, in support of its argument that "control" under the Act should be limited to concepts of agency, is clearly misplaced. The court in *Stansifer* did not decide the issue of whether the distributor in question there had been "under the control" of the manufacturer, as that term is used in 15 U.S.C. § 1221(a). Indeed, the court in *Stansifer* tacitly conceded that such "control" might have been present. See 487 F.2d 59, at 64, n. 10. The Court in *Stansifer* limited its inquiry to deciding whether the written agreement between the plaintiff-dealer and the original distributor was sufficient to establish that separate statutory requirement in an action against the successor distributor. See 487 F.2d 59, at 63.

**8.** Reference, herein, will be to the Agreement between MAT and TMS entered into on March 17, 1970 in Tokyo, Japan, as that was the agreement in effect when the plaintiffs' franchise was terminated.

cated. Moreover, the initial appointment of any dealer or any tentative appointment required the prior written consent of the importer and before appointing any new dealer the distributor had to submit a dealer application and any information on the dealer requested by the importer to the importer for its written approval of the applicant. Under that portion of the agreement, then, TMS did have the final say as to what dealers would be appointed. In addition to having the right to tell the distributor what dealers he could appoint, the importer, TMS, also controlled the agreement between the distributor and the dealer by requiring the distributor to execute a "dealer selling agreement" prepared by the importer, TMS. The distributor was also required to submit to the importer for its prior written approval before delivery to the dealer, all such dealer selling agreements.

Paragraphs 3, 4, 7 and 8 of Article III, detailed to some extent the general operating standards and procedures which MAT agreed to impose on its dealers. Paragraphs 2 and 4 combined to provide a mechanism for open-ended, continuing control of dealer operations by TMS. Under Paragraph 2, MAT agreed to pass on to its dealers all directions and suggestions by TMS related to dealer operations. Paragraph 4, in turn, provided that MAT would require its dealers to "comply with . . . such standards as Importer may prescribe from time to time . . . ."

Article VI, Paragraph 5, specifically obligated MAT to use its best efforts in enforcing its dealer agreements. Article XIII, Paragraph 1(a) and (b) provided for the termination of MAT's distributorship agreement for its failure to comply with the terms of the agreement, which would include the terms set forth herein. Finally, under Article VI, Paragraph 6, it was agreed that upon the termination of MAT's distributorship, TMS would be subrogated to all of MAT's rights, vis a vis MAT's dealers.

To reiterate, the Court cannot but conclude that ultimate control over dealer operations came not from the distributor, MAT, but from the importer, TMS, and simply passed through the distributor. That control was all-pervasive. The importer, in turn, was a wholly owned subsidiary of the manufacturer, TMC, Ltd. of Japan, and the requisite chain of control is thereby established.

### III. FUTURE PROCEEDINGS.

In reference to future proceedings herein, the Court emphasizes that the Automobile Dealers' Act does not prevent an automobile manufacturer, its corporate affiliates, or, pertinent to this case, a "controlled" middle man from terminating a dealer franchise for cause shown. 15 U.S.C. § 1222. See, e. g., Woodard v. General Motors Corp., 298 F.2d 121 (5th Cir. 1962), cert. denied, 369 U.S. 887, 82 S.Ct. 1161, 8 L. Ed.2d 288, rehearing denied, 370 U.S. 965, 82 S.Ct. 1584, 8 L.Ed.2d 834 (1962); Garvin v. American Motor Sales Corp., 318 F.2d 518 (3d Cir. 1963). But, cf., Zebelman v. Chrysler Corp., 299 F.Supp. 653, 658 (E.D.Mo.1968) with Madsen v. Chrysler Corp., 261 F.Supp. 488 (N.D.Ill.1967). (Failure to meet arbitrary performance standards, common among other dealers also, must not be used as a pretext for termination actually based on an improper ulterior motive). The Act simply requires good faith dealing between the parties. 15 U.S.C. § 1222. This, in turn, means that coercion and intimidation by the manufacturer, and those which it controls, be lacking. 15 U.S.C. § 1221(e). See Milos v. Ford Motor Co., 317 F.2d 712 (3rd Cir. 1967). But, cf., Autowest, Inc. v. Peugeot, Inc., 434 F.2d 556, 561 (2d Cir. 1970) (Conditions for which there is no quid quo pro are "particularly suspect" under the Act).

For the reasons stated, the defendant's motion for summary judgment must be denied.

An appropriate order shall issue.