**Obie U. TURNER, d/b/a Turner GMC Trucks, Plaintiff,**

v.

**SUBARU OF AMERICA, INC., et al., Defendants.**

Civ. A. No. 82–0111–L.

United States District Court,
W.D. Virginia,
Lynchburg Division.

June 6, 1983.

---

Sidney H. Kirstein, Lynchburg, Va., for plaintiff.

Henry M. Sackett, III, Bevin R. Alexander, Jr., Lynchburg, Va., for defendants.

## MEMORANDUM OPINION

TURK, Chief Judge.

Plaintiff, a sole proprietor operating an automobile dealership in Martinsville, Virginia, instituted this action against defendants on June 14, 1982, alleging that they violated the Virginia Retail Franchising Act, Va.Code § 13.1–557 to 13.1–574 ("VRFA") in connection with incidents that occurred between May 9, 1978 and January 31, 1979.

Defendant Subaru of America, Inc. ("SOA") is a major, but not the exclusive, importer of Subaru automobiles into the United States. SOA has in turn entered into contracts with some fifteen distributors, each representing a different geographical area, by which distributors are entitled to grant dealership contracts. SOA supplies the distributors, and the distributors supply the dealers.

SOA entered into a written distributorship agreement with Mid-Atlantic Subaru Star, Ltd. ("MASS") in 1970. MASS thereby became SOA's distributor over an area which included Virginia. On April 8, 1977, MASS entered into a written "Subaru Dealership Agreement" with plaintiff. MASS and plaintiff were the sole parties to the agreement. (The agreement, however, was a form contract supplied to MASS by SOA.)

It provided for a termination date of December 31, 1977. In addition, the agreement provided that MASS could terminate the agreement, *inter alia,* in the event of "Termination, expiration, or relinquishment of Distributor's franchise as a distributor of Subaru Products." ¶ 17.2.13. On December 16, 1977, MASS and plaintiff entered into an addendum by which the contract's term was extended until December 31, 1978.

On April 20, 1978, SOA incorporated defendant Subaru Atlantic, Inc. ("SAI") in Maryland, as a wholly owned subsidiary. On May 9, 1978, SOA sent plaintiff a mailgram indicating that the MASS distributorship agreement had been terminated on May 2, 1978. The mailgram further stated: "As you may know, your dealership agreement with Mid Atlantic automatically terminated upon the termination of the Mid Atlantic franchise to distribute Subaru products. This letter is not intended to create, extend, or renew any dealership agreements." The mailgram notified plaintiff that SAI was the new distributor (no written agreement exists between SOA and SAI), and indicated that Mr. James Welsh, SAI's general manager, would contact plaintiff "and explain procedures for vehicle purchases and floor plan arrangements, parts purchases and payments, and submission of warranty claims and owner registrations during a sixty day transition period." Finally, it said:

> Upon obtaining distributor licensing or other authority to operate, SAI will make every effgrt [sic] to fulfill your immediate needs for Subaru products. However, a personal visit and a favorable dealer evaluation by a SAI representative will be necessary before SAI can offer to enter into a new dealership agreement with your company after the sixty day transition period.

This mailgram "frightened" and "upset" plaintiff. Turner Dep. at 20, 13. He consulted some of his employees concerning it, but not an attorney. *Id.* at 44. He just "continued as usual, and waited to see what was going to happen next." *Id.* at 13. He expected SAI "to evaluate everything and

pick up where Mid-Atlantic had left off." *Id.* at 23.[1]

The mailgram did not lead plaintiff to understand that MASS was no longer a dealer because it "didn't mean there wasn't going to be some court action, and it didn't mean it wasn't still up in the air." *Id.* at 43. However, he received a communication from MASS dated May 17, 1978 concerning this "subject": "Termination of MAS[S] and Your Dealership Agreement." The letter did not explicitly indicate that Plaintiff had been terminated, or that the dealership contract had been cancelled by MASS, but both of those facts are evident from the letter's tenor and "subject" heading.

In a letter dated June 27, 1978, SAI contacted "companies . . . which were authorized Subaru dealers on May 4, 1978" within SAI's zone of operations. The letter described SAI's organization and intentions, and indicated:

> As you know, we completed a review of your company some weeks ago, and have since been analyzing all of those reports. Within the next few weeks, we will be in contact with you to invite you to Columbia[, Maryland] to discuss what is required in order to enter into a franchise agreement. We will be discussing working capital requirements, facilities, personnel, sales potentials, and new car floor plan requirements amongst other minimum requirements.
>
> Therefore, in order to accomplish the above objectives in the most orderly way possible, we are extending to September 30, 1978, the transition period first mentioned in Harvey Lamm's mailgram to you dated May 12, 1978, and its several attachments. We must again stress, however, that neither this mailgram nor any prior mailgram or letters are intended to, and they do not, create, extend or renew any dealership agreements.

The letter then indicated what former dealers could expect in terms of shipments over the following several months. Cars would be distributed on what SAI considered to be "a fair and equitable basis," based on each dealer's record, inventory, and "a reasonable sales forecast."

During August 1978, SAI promulgated national "Subaru Dealership Minimum Standards" to which all Subaru dealers would be required to conform.

On September 14, 1978, SAI sent plaintiff a letter indicating that the negotiation process for franchise agreements would begin immediately. Three blank forms were sent to plaintiff pertaining to his financial status, with the instructions to complete and return them. The letter said, in addition: "We must again stress that neither this letter nor any prior Mailgrams or letters are intended to, and they do not create, extend or renew any dealership agreements." Plaintiff says these documents were executed and sent to SAI. Turner Dep. at 25–26. (Defendants maintain these were never sent. Coyle Aff., ¶ 7. For the purpose of deciding this motion, the court assumes that plaintiff's version is correct.)

On September 27, 1978, SAI again wrote to plaintiff in anticipation of an upcoming meeting. Included was a statement informing plaintiff as to his deficiencies in complying with the August 1978 "minimum standards." Because of the deficiencies, the enclosure stated, SAI could not at that time offer plaintiff a Subaru dealership. However, it said:

> By our letter to you of June 27, 1979, we advised your company that Subaru Atlantic, Inc. would attempt to meet your day-to-day needs for Subaru Products through September 30, 1978. That voluntary commitment on our part still stands and is hereby extended to January 31, 1979, provided that your company furnishes us with [various requirements].

The deficiencies, and the correction date assigned thereto, were: (1) lack of current financial statement—Nov. 10, 1978; (2) in-

---

**1.** After making this statement plaintiff was asked: "Did you get that impression from anything anybody told you, or just from you [sic] own analysis of the situation?" Turner Dep. at

**23.** His unresponsive reply was: "Well, it hadn't been but about a year since I had been approved to be a Subaru dealer." *Id.*

sufficient net working capital—Jan. 31, 1979; (3) insufficient cash—Jan. 31, 1979; and (4) no showroom—Jan. 31, 1979. Plaintiff was required to execute, by October 31, 1978, an enclosed letter of intent indicating his intention to remedy the deficiencies by the designated dates. His failure to do so would result in SAI's decision not to enter into a franchise agreement becoming final on January 31, 1979. SAI also indicated that it would consider extending the correction dates "if justified by substantial good faith progress by [plaintiff] in correcting each of the specified deficiencies on the Deficiency List." The letter concluded with a prominent "Important Notice" summarizing SAI's requirements and intentions.

Plaintiff and his accountant met with Mr. Welsh and two other SAI officials on October 16, 1978, in Columbia, Maryland. They discussed the deficiencies noted in SAI's letter of September 27, 1978. The meeting only lasted five minutes. Turner Dep. at 28. Plaintiff was not concerned about the first three deficiencies, and could have corrected them easily. However, he refused to accede to SAI's requirement that he construct a four-vehicle showroom. He "didn't want to do that; [he] didn't think they could furnish [him] 100 cars a year. [He] didn't know how [he] would be able to pay for it." Id. at 30. However, he did not discuss these concerns with the SAI officials, but rather "assumed from [his] own analysis that they would not be able to provide [him] with 100 cars . . . ." Id. at 30–31. He did not discuss Subaru's ability or intention to supply him with 100 cars a year because "it's no use to discuss it with anyone like that. * * *. [I]t's politics involved, and the dealers that they favor get the cars." Id. at 48. He felt that he would require 100 cars a year to pay for a four car showroom. Id. at 31. He was also afraid that SAI, having unfettered discretion, could refuse to enter into an agreement even if he did build the showroom. Id. He never discussed with SAI what type of a showroom (other than one capable of holding four cars) would be required. Id. at 37. Square footage was not discussed. Id. at 38. (However, the "Minimum Standards"

apparently indicated that 960 square feet were required. Id. at 59.) None of the foregoing matters were discussed because the SAI representatives told plaintiff that, if he did not want to build a showroom, there was nothing to discuss. Id. at 31.

As a result of the failure of the meeting, plaintiff did not execute the letter of intent. Id. at 38–39. Thereafter, SAI sent plaintiff the following letter, dated November 3, 1978:

Dear Mr. Turner:

During our discussion at Subaru Atlantic on October 16, you indicated that you would not conform to the minimum Subaru dealership standards as specified in our letter of September 27, 1978. By your not signing the Letter of Intent by the specified date of October 31, 1978, our decision not to enter into a Subaru dealership agreement with your company becomes effective January 31, 1979.

At that time we will discontinue supply of Subaru products to your company and you must discontinue any and all appearances of conducting authorized Subaru operations.

Plaintiff continued to deal in Subaru products until January 31, 1979, when he was finally terminated. Between his receipt of the SOA mailgram on May 9, 1978 and the January 31, 1979 termination, he took delivery of fourteen or sixteen vehicles. Id. at 14. (Invoices dated May 31, 1978 indicate that fourteen vehicles were shipped to plaintiff. Pl. Exh. 15. An additional eleven vehicles are crossed out. Because of plaintiff's deposition testimony, the court assumes that the latter deliveries were cancelled.) Plaintiff also obtained parts from SAI and performed warranty work which was billed to SOA. Pl. Exh. 16–18. In September 1978, SAI sent plaintiff a flyer describing its Technical School, and the requirement that each "dealer" send mechanics thereto. In addition, SAI correspondence dated February 1, 1979 indicates that a "dealer"—i.e., plaintiff—"has been terminated as of January 31, 1979." Pl. Exh. 21. (Plaintiff also relies on an undated flyer pertaining to Subaru tools

that "dealers," including plaintiff, must keep in stock. Pl.Exh. 20.)

Defendants have moved for summary judgment based on the foregoing facts. They urge four grounds to support judgment in their favor. The court concludes that one of the grounds is dispositive of this matter, and that it is accordingly unnecessary to address the other three.

## I.

Defendants maintain that the statute of limitations contained in the VRFA, Va.Code § 13.1–571(b), bars this action. That section provides: "No suit shall be maintained to enforce any liability created under this section unless brought within four years after the cause of action upon which it is based arose." Because this suit was filed on June 14, 1982, it must be dismissed, on the statute of limitations ground, unless the "cause of action upon which it is based arose ..." subsequent to June 14, 1978.

The parties have treated the issue as if it turns on the determination as to when the statute of limitations began to run. Defendants say that the statute began to run on May 9, 1978, when SOA notified plaintiff that his franchise had been terminated. Plaintiff maintains that it began to run as late as January 31, 1979, when all dealings between the parties ceased. This characterization of the issue, however, is somewhat misleading. To the extent plaintiff's complaint is premised solely on the May 9, 1978 termination, it is surely barred by the statute of limitations. To the extent, however, it is premised on events occurring subsequent to June 14, 1978, it is clearly within the statute of limitations. The sole question, then, is whether defendants' behavior, after that date, provides a basis for recovery under the VRFA. In fact, the parties

arguments as to the statute of limitations point amount to a discussion of the merits, and this court will treat it as such.

Plaintiff has sued under Va.Code § 13.1–564 which provides: "It shall be unlawful for a franchisor to cancel a franchise without reasonable cause or to use undue influence to induce a franchisee to surrender any right given to him by any provision contained in the franchise." The statute's unequivocable language clearly indicates that, in order for a defendant to be liable, he must "cancel" a "franchise." A "franchise" is "a *written contract or agreement* .... between two or more persons ...." Va. Code § 13.1–559 (emphasis added). The court agrees that there was never any "written contract or agreement" between these parties within the limitations period, and the complaint must accordingly be dismissed.

Plaintiff suggests several theories by which this court might find that a written agreement existed between the parties after June 1968, but these can be expressed as two essential theories: (1) that documents exchanged between the parties after MASS was terminated created a franchise "at will" that defendants could not cancel without reasonable cause; and (2) that the franchise agreement between MASS and plaintiff should be imputed to SAI because both SAI and MASS were under SOA's "control."

Some authority exists for the theory that an "at will" franchise agreement may be created by the parties' actions. *See Autowest, Inc. v. Peugeot, Inc.,* 434 F.2d 556, 563 (2d Cir.1970); *DeCantis v. Mid-Atlantic Toyota Distributors, Inc.,* 371 F.Supp. 1238, 1243 (E.D.Va.1974). In *Autowest,* however, no pertinent authority or rationale is supplied to support the court's conclusion.[2] In

---

**2.** The court did rest its conclusion in part on the rationale that the Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–1225, makes it unlawful for a manufacturer to fail to act in good faith in, *inter alia,* "not renewing the franchise ...." 15 U.S.C. § 1222. The VRFA does not contain a like prohibition. *Cf.* Virginia Motor Vehicle Dealer Licensing Act, Va.Code §§ 46.1–515 to 46.1–550.5 ("VMVDLA"), which

makes it unlawful for "any ... distributor ... to terminate, cancel or refuse to renew the franchise of any dealer, without good cause ...." Va.Code § 46.1–547(e). In this regard, it is not clear to the court why plaintiff did not sue under the VMVDLA. Both parties appear to assume that no private right of action exists under that law, but § 46.1–550.1(C) seems to belie that assumption. In addition, the statute

*DeCantis,* the court rested its conclusion in part on the theory that the successor distributor, by its action, may have adopted the contract which existed between its predecessor and the plaintiff dealer. That is not the case here; SAI clearly indicated, in all of its correspondence, that no franchise arrangement existed between itself and plaintiff.

Plaintiff argues, however, that, notwithstanding SAI's disclaimers in this regard, the latter created an at will franchise agreement by instituting and extending the "transition period," and by shipping automobiles and parts on a cash basis. Plaintiff also relies on the warranty repair reimbursements received from SOA, and on the other various documents suggesting that SAI and SOA considered plaintiff to be a "dealer." The court concludes, however, that SAI's institution of the "transition period," and its delivery of Subaru products pursuant thereto on an *ad hoc* basis, was nothing but an unbargained-for promise, unsupported by consideration, and lacking in mutuality. *See Ford Motor Co. v. Kirkmyer Motor Co.,* 65 F.2d 1001 (4th Cir.1933). It was not a written "franchise" of the sort contemplated by the VRFA.

Plaintiff argues in the alternative that the franchise agreement between himself and MASS should be imputed to SAI. *De-Cantis,* 371 F.Supp. at 1241–43, strongly supports this view. In that case, the manufacturer (TMC) terminated its wholly-owned subsidiary (TMD) as distributor, and hired an independent concern (MAT) as its new distributor. Plaintiff operated under a written franchise agreement with TMD, which was to expire by its own terms after the change in distributors. MAT continued to deal with plaintiff, but at the same time it attempted to negotiate a new franchise agreement. When the parties failed to agree on a new contract, MAT ceased to deal with the plaintiff. Plaintiff sued under the federal Automobile Dealers' Day in Court Act, 15 U.S.C. §§ 1221–1225.

The court found that MAT, although not strictly an "agent" of TMC, was "controlled" by it within the meaning of 15 U.S.C. § 1221(a). Because TMD was also "controlled" by its parent, TMC, the court held that the contract between TMD and plaintiff, and the distributor's obligations thereunder, should be imputed to MAT. The court relied on the Act's purpose, which is to curtail abuse of dealers resulting from franchisors' vastly superior bargaining strength. 371 F.Supp. at 1241. (The VRFA is designed to effect a similar purpose. Va.Code § 13.1–558.) The court reasoned:

> A manufacturer should not be permitted to avoid the continued impact of the Act, *vis a vis* already existing dealer relationships, by the simple expedient of replacing a subsidiary wholesale distributor with an organizationally independent, but "controlled" middleman. Under the present hypothesis, both are the *alter ego* of the manufacturer for the limited purposes of the Act. * * *. Accordingly, the transfer of wholesaling operations from any such entity to the other should be held to be paralleled by a *pro tanto* transfer of existing obligations under the Act. Again, it is the seat of power which the Act is intended to ultimately affect, not the medium through which it is exercised.

371 F.Supp. at 1242 (footnote omitted). The court held that an "agency" relationship between TMC and MAT was not required, as long as MAT was under TMC's "control." (*Stansifer v. Chrysler Motor Corp.,* 487 F.2d 59 (9th Cir.1973), holding to the contrary, was disapproved in *DeCantis.*) The court said finally:

> The true issue in cases such as *Stansifer v. Chrysler Motors Corp., supra,* and the instant case ... is not, therefore, whether the statutory requirement of a written agreement has been met. The dealer's agreement with the original distributor is sufficient to establish that ingredient. Rather, the issue is whether

---

of limitations under the VMVDLA is, apparently, five years. *See E.L. Bowen & Co. v. Ameri-*

*can Motor Sales Corp.,* 153 F.Supp. 42, 45 (E.D. Va.1957).

the ultimate reins of control over retail dealer operations has remained in the hands of the manufacturer throughout. 371 F.Supp. at 1243.

*Stansifer,* disapproved in *DeCantis,* involved a situation even more closely akin to the one at bar. Plaintiff Stansifer was an automobile dealer operating under an agreement with "Jim Fisher Motors," an independent, but arguably "controlled" distributor. Fisher operated under a distributorship agreement with Chrysler Motors Corp. Chrysler eventually terminated Fisher's distributorship, and its own agents attempted to negotiate a new franchise agreement. Stansifer was not satisfied with the proposed terms, and he declined Chrysler's offer. He then instituted suit under a state act and the federal Automobile Dealers' Day in Court Act. The Ninth Circuit affirmed a summary judgment in favor of the defendants on the ground that no written "franchise" existed between Chrysler and the plaintiff:

> There was no written agreement between Chrysler and Stansifer. The written agreements were between Chrysler as manufacturer and Fisher as distributor and between Fisher as distributor and Stansifer as dealer. Nor is there any evidence that Chrysler had any direct dealings with Stansifer prior to the termination of the dealer agreement between Fisher and Stansifer.

487 F.2d at 64. The court then went on to find that Fisher was not the "agent" of Chrysler in the traditional sense, relying partly on a provision in the distributorship agreement to that effect. (A similar provision was included in the SOA/MASS agreement.) Stansifer argued that the distributorship agreement gave Chrysler such power over Fisher's operations *vis a vis* dealers that Fisher was nothing but a "straw man" between Chrysler and Stansifer. (Plaintiff in the case at bar makes a similar argument based on similar provisions in the SOA/MASS agreement.) The court held that such provisions were "not uncommon," and did not create an "agency" relationship, "but rather one of buyer and seller." 487

F.2d at 65. Accordingly, the contract between Stansifer and Fisher could not be imputed to Chrysler.

The result in *DeCantis* appears to have resulted from equitable considerations arising out of the purposes behind, and the express provisions of the federal Act. Several distinctions between that case and the instant one, however, render it of limited usefulness. First, the predecessor distributor in *DeCantis* was the wholly-owned subsidiary, whereas the successor distributor was an independent company. In the instant case (as well as in *Stansifer*), the order was reversed. This is significant because the termination of a subsidiary should ordinarily be much easier to accomplish than the termination of an independent, even if "controlled," distributor. It is much more reasonable to impute any contracts to which the wholly owned subsidiary is obligated, in the former situation, to its successor; this is so because, when the first distributor is wholly owned by its supplier, there are absolutely no checks, absent any legal restraints, on the latter's ability to avoid the former's obligations by simply dissolving it and hiring another in its place.

Second, *DeCantis* was decided under the federal Act, which makes it unlawful to fail to renew a franchise under certain circumstances. The RFA has no such provision. (Such a provision is found in the Virginia Motor Vehicle Dealer's Licensing Act. *See* note 2, *supra.*) It is not clear to what extent *DeCantis* (and *Autowest*) were decided on the basis of that prohibition, as opposed to the one against unjustified "cancellation" or "termination." It is obvious, however, that a prohibition against failure to renew would have strengthened plaintiff's case considerably, because it would be implied that the plaintiff could have recovered even after the franchise had expired. *See DeCantis,* 371 F.Supp. at 1243–44.

Third, the federal Act specifically includes in the definition of an "automobile manufacturer" one who "is under the control of such manufacturer . . . in connection with the distribution of said automotive vehicles." 15 U.S.C. § 1221. The analo-

gous definition of "franchisor" under the RFA does not mention the "control" criterion. Va.Code § 13.1–559(d). This is important because *DeCantis* places such an emphasis on the degree of "control" between TMC and MAT. It is not readily apparent that "control" is a relevant factor under the RFA.[3]

Because of these differences, neither *DeCantis* nor *Stansifer* are controlling in the matter at bar. Nevertheless, they are the closest authority to be found in interpreting Virginia's Retail Franchising Act. Because of this, a closer analysis of those cases is in order. With regard to *DeCantis*, this court cannot completely subscribe to its rationale. *DeCantis* seems to rest, ultimately, on the fact that both TMD and MAT were "controlled" by TMC, and that the statute included, as a "manufacturer" subject to liability under the Act, one under the manufacturer's "control." From this, *DeCantis* leaps to the conclusion that any agreement between the first "controlled" distributor and a dealer must be assumed by the second "controlled" distributor. This court is not sure that the conclusion follows from the premise.

The "straw man" analysis utilized in *Stansifer* is more compelling. However, this court is not convinced that the finding of an "agency" relationship between Chrysler and Fisher would necessarily have led to the conclusion that the latter was a "straw man."

An apt analogy may be drawn from cases decided under the nation's labor laws. In *National Labor Relations Board v. Burns International Security Services, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), the Court found, *inter alia,* that a *bona fide* successor employer is not required to assume the collective bargaining agreement in effect between its predecessor employer and a union. 406 U.S. at 282–91, 92 S.Ct. at 1579–1584. This follows from "the principles of law governing ordinary contracts"

which "would not bind to a contract an unconsenting successor to a contracting party . . . ." *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 550, 84 S.Ct. 909, 914, 11 L.Ed.2d 898 (1964). However, a successor employer may be bound by its predecessor's legal and contractual obligations if it is the latter's "*alter ego,*" that is, " 'merely a disguised continuance of the old employer.' " *Howard Johnson Co. v. Hotel Employees,* 417 U.S. 249, 259 n. 5, 94 S.Ct. 2236, 2242 n. 5, 41 L.Ed.2d 46 (1974), *quoting from Southport Petroleum Co. v. National Labor Relations Board,* 315 U.S. 100, 106, 62 S.Ct. 452, 455, 86 L.Ed. 718 (1942).

The principles are readily applicable to the instant matter. Accordingly, the court concludes that SAI can be deemed to have assumed the franchise agreement between MASS and plaintiff only if SAI was MASS's "*alter ego.*" (In fact, in *DeCantis,* the court said that each distributor was the "*alter ego*" of the manufacturer "for the limited purposes of the Act." 371 F.Supp. at 1242. This suggests that an "*alter ego*" type of analysis is appropriate.)

The court concludes further, however, that SAI was not the "*alter ego*" of MASS. MASS was an independent company which was terminated by SOA and, apparently, the separation was not amicable. SOA then replaced MASS with SAI, its wholly-owned subsidiary. In no way can SAI and MASS be called "*alter egos*" of one another.

Plaintiff also seems to argue that, due to the continuity of SOA in the parties' relationships, the obligations under the franchise agreement continued. In other words, SOA + SAI is the "*alter ego*" of SOA + MASS. Assuming this to be true, however, the court would have to conclude that the statute of limitations did begin to "run" on May 9, 1978, when SOA "canceled" plaintiff's "franchise."

Plaintiff invokes the rule in Virginia that, "where there is an undertaking which requires a continuation of services, the stat-

---

**3.** It is therefore unnecessary to decide whether MASS was under SOA's "control" within the contemplation of the federal Act. *Cf. Grappone, Inc. v. Subaru of America, Inc.,* 403

F.Supp. 123, 137 (D.N.H.1975) (supporting argument that SOA "controls" its distributors under federal Act).

ute of limitations does not begin to run until the termination of the undertaking." *McCormick v. Romans,* 214 Va. 144, 198 S.E.2d 651, 654 (1973). *See, also, Wilson v. Miller,* 104 Va. 446, 51 S.E. 837 (1905); *Riverview Land Co. v. Dance & Co.,* 98 Va. 239, 35 S.E. 720 (1905). Although this principle may appear at first blush to control the case at bar, an examination of the foregoing cases reveals that the principle has no application here. In each of the cases, an agency relationship existed between the litigants; and, in each case, one of the litigants attempted to collect from the other for expenses or obligations arising prior to the termination of the agency. Even assuming that a franchise is an "agency" or "undertaking" for the purposes of the rule, this case is somewhat different: plaintiff seeks to recover for what he contends is the unlawful termination of the "agency" or "undertaking" itself. The parties' dealings after May 9, 1978, proceeded under the assumption that plaintiff's franchise had been terminated on that date; under those circumstances, the statute began to run on May 9, 1978. (The rule invoked by plaintiff might have applied if, for example, the franchise expired by its own terms on December 31, 1978, and plaintiff instituted this action to recover for monies due for expenses accruing prior to June 6, 1978.)

█ Accordingly, insofar as the claims herein rely on the continuing control of SOA over the distribution process, the cause of action accrued on that date, and it is hence barred by the statute of limitations.

## II.

█ Plaintiff also seeks relief under Va. Code § 13.1–563 which provides, in relevant part:

It shall be unlawful for any person in making an offer to grant a franchise, whether or not a franchise fee is required, directly or indirectly:

(a) To employ any device, scheme or artifice to defraud, [or]

\*    \*    \*    \*    \*    \*

(c) To engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the franchisee . . . .

Paragraph 19 of the complaint alleges that defendants'

subsequent offer to extend or renew said [franchise] agreement on the condition that plaintiff comply with the . . . Minimum Standards, knowing full well that plaintiff could not meet those greater standards in the short time given and then rebuffing plaintiff's good faith efforts to meet these standards was an unreasonable termination and constitutes the type of scheme or devise [sic] made illegal under Va.Code § 13.1–563, which has caused plaintiff to forfeit his valuable franchise rights in violation of Va.Code § 13.1–564.

The Act does not grant any direct right of action for violations of § 13.1–563. Va. Code § 13.1–571(a). Aggrieved persons may void any franchises signed under the circumstances described in § 13.1–563. Va. Code § 13.1–565. (Any plaintiff so voiding a franchise may then sue for damages resulting therefrom. Va.Code § 13.1–571(a).) The court concludes that § 13.1–564 does not provide an independent cause of action for purported violations of § 13.1–563, and that paragraph 19 of the complaint should also be dismissed. Indeed, the parties, including plaintiff, seem to have completely ignored that allegation of the complaint throughout this litigation.

Based on the foregoing, defendants' motion for summary judgment will be granted. The issue is close, but the court concludes that, ultimately, any actionable harm accruing to the plaintiff dates back to his termination by SOA on May 9, 1978, and it is therefore barred by the statute of limitations. No written "franchise" existed, after that date, which defendants could have unlawfully "cancelled."[4]

---

4. The particular problems arising from application of the VRFA to cases involving automobile dealerships and franchises will not be present

for causes of action accruing after March 1, 1979 because of the operation of VMVDLA § 46.1–550.5, which was added to the Virginia

In light of this disposition, it is unnecessary to address the remaining grounds for relief asserted by defendants.  An appropriate order will issue.

Code by 1979 Va.Acts c. 105, and which provides: "Franchise agreements subject to the provisions of this chapter shall not be subject to any requirements contained within chapter 8 of Title 13.1 (§ 13.1–557 et seq.) of this Code."